UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

|  |  |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION,<br><br>  Plaintiff,<br><br>v.<br><br>MARK OLSEN MINING COMPANY and BETTY LEA GRIMES,<br><br>  Defendants. | )<br>)<br>)<br>) Case No.<br>)<br>)<br>) COMPLAINT FOR INJUNCTIVE<br>) AND OTHER EQUITABLE RELIEF,<br>) RESTITUTION, AND CIVIL<br>) MONETARY PENALTIES UNDER<br>) THE COMMODITY EXCHANGE<br>) ACT AND COMMISSION<br>) REGULATIONS<br>) |

Plaintiff Commodity Futures Trading Commission ("Commission"), by its attorneys, alleges as follows:

## I.   SUMMARY

1. From at least April 2013 and continuing through at least February 2014 (the "Relevant Period"), Mark Olsen Mining Company ("MOMC"), by and through the actions of its employees and agents, including but not limited to, Betty Lea Grimes ("Grimes"), (collectively, "Defendants"), defrauded others in connection with precious metals.

2. Defendants' fraud occurred through two schemes. First, Defendants offered to enter into, and conducted an office or business in the United States for the purpose of soliciting or accepting, orders for the purchase or sale of precious metals from retail customers on a leveraged or financed basis ("retail commodity transactions" or "financed transactions"). The financed transactions did not result in actual delivery of metals to customers. As a result, these transactions constituted illegal, off-exchange retail commodity transactions. Second, Defendants

purported to sell customers precious metals on a fully-paid basis in which customers provided 100% of the purchase price.

3. During the Relevant Period, Defendants obtained more than $870,000 from three customers ("MOMC Customers") for the purchase of precious metals, either on a leveraged or fully paid basis. The MOMC Customers never received the precious metals. Instead, Defendants misappropriated the entire amount that the MOMC Customers paid to MOMC, using some funds for Grimes' personal expenses, and sending the remaining customer funds to a person purporting to be Mark Olsen ("Olsen"), via wire transfer to banks located in South Africa.

4. In their solicitations to actual and potential customers, Defendants used a web site, www.markolsenmining.com (the "MOMC web site"), as well as marketing materials, that contained false representations to defraud customers who wished to purchase precious metals from MOMC. Defendants made additional misrepresentations in direct oral and written communications with customers.

5. By virtue of this conduct and the conduct further described herein, Defendants have engaged, are engaging, or are about to engage in conduct in violation of Sections 4(a), 4b(a)(2), and 6(c)(1) of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 6(a), 6b(a)(2), 9(1) (2012), and Commission Regulation ("Regulation") 180.1(a), 17 C.F.R. § 180.1(a) (2017).

6. At all relevant times, the acts and omissions of Grimes were committed within the scope of her employment, agency, or office with MOMC. Therefore, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2017), MOMC is liable as a principal for the actions and omissions of Grimes in violation of the Act and Regulations.

7. At all times during the Relevant Period, Grimes was the controlling person of MOMC. Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012), Grimes is liable as a controlling person for the actions and omissions of MOMC in violation of the Act and Regulations.

8. Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1(a) (2012), the Commission brings this action to enjoin Defendants' unlawful acts and practices, to compel compliance with the Act and Regulations, and to further enjoin Defendants from engaging in any commodity-related activity.

9. In addition, the Commission seeks civil monetary penalties, restitution, and remedial ancillary relief, including but not limited to, trading and registration bans, disgorgement, rescission, pre-judgment and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

## II. JURISDICTION AND VENUE

10. This Court has jurisdiction over this action under 28 U.S.C. § 1331 (2012) (federal question jurisdiction) and 28 U.S.C. § 1345 (2012) (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress). Section 6c(a) of the Act, 7 U.S.C. § 13a-l(a) (2012), authorizes the Commission to seek injunctive relief against any person whenever it shall appear that such person has engaged, is engaging, or is about to engage in any act or practice that violates any provision of the Act or any rule, regulation, or order promulgated thereunder.

11. With respect to Defendants' retail commodity transactions, the Commission also has jurisdiction over the conduct and transactions at issue pursuant to Section 2(c)(2)(D) of the Act, 7 U.S.C. § 2(c)(2)(D) (2012).

12. Venue properly lies with this Court pursuant to Section 6c of the Act because Defendants are found in, inhabit, or transact business in this District, or the acts and practices in violation of the Act and Regulations occurred, or are occurring, or are about to occur within this District, among other places.

### III.   PARTIES

#### A.   Plaintiff

13. Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act, and the Regulations promulgated thereunder.

#### B.   Defendants

14. **Betty Lea Grimes** is a resident of Florida. Grimes has used the following names, and combinations of these names, in various legal documents: Betty Grimes, Lea Grimes, Lea Lauren, Betty Nehme, and Lea Nehme. Grimes has never been registered with the Commission.

15. **Mark Olsen Mining Company** is a corporation registered in Florida. Grimes is its sole officer and director. MOMC's headquarters and mailing address was Grimes' previous residential address in Boca Raton, Florida. MOMC was incorporated in April 2013, and administratively dissolved in September 2015. MOMC has never been registered with the Commission.

### IV.   STATUTORY BACKGROUND

16. Section 2(c)(2)(D) of the Act, 7 U.S.C. §2(c)(2)(D) (2012), gives the Commission jurisdiction over "any agreement, contract, or transaction in any commodity" that is entered into with, or offered to, a non-eligible contract participant ("ECP") "on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror

or counterparty on a similar basis" with respect to conduct occurring on or after July 16, 2011, subject to certain exceptions not applicable here.  Section 2(c)(2)(D) of the Act makes Section 4(a) of the Act, 7 U.S.C. §6(a) (2012), applicable to retail commodity transactions "as if" such transactions are contracts for the sale of a commodity for future delivery.

17. Section 1a(18)(xi) of the Act, 7 U.S.C. § 1a(18)(xi) (2012), defines an ECP, in relevant part, as an individual who has amounts invested on a discretionary basis, the aggregate of which exceeds $10 million, or $5 million if the individual enters into the transaction to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual.

18. Section 4(a) of the Act, in relevant part, makes it unlawful for any person to offer to enter into, execute, confirm the execution of, or conduct any office or business anywhere in the United States for the purpose of soliciting, accepting any order for, or otherwise dealing in any transaction in, or in connection with, a contract for the purchase or sale of a commodity for future delivery unless the transaction is conducted on or subject to the rules of a board of trade that has been designated or registered by the Commission as a contract market.

## V. FACTS

19. During the Relevant Period, Defendants obtained more than $870,000 from three customers for the purported purpose of investing in precious metals.  Defendants misappropriated all of the customer funds they received, and customers received no metals.

20. As part of their scheme, Defendants used the mails or other instrumentalities of interstate commerce to: (1) receive wire transfers from the MOMC Customers; (2) disseminate marketing documents to the actual and potential customers of MOMC; and (3) disseminate contracts containing false statements to actual and potential customers of MOMC.

### A. MOMC Background

21. The fraudulent scheme began in 2013, when Grimes created MOMC after agreeing to do business with Olsen. Grimes had met Olsen in July 2012 through an online dating web site. At that time, Grimes was working as a salesperson for a firm that sold wholesale diamonds to retail customers, and Olsen purported to be working in the precious metals mining business in Africa. Although they lived on separate continents, Grimes and Olsen became romantically involved, communicating regularly via Skype, telephone, and email. Olsen offered to go into the metals business with Grimes; after the diamonds business closed and Grimes became unemployed, Grimes agreed to work with Olsen in selling precious metals to her former customers.

22. Grimes created MOMC in April 2013, filing corporate documents with the Florida Secretary of State, and listing her residence as both the principal place of business and mailing address for the company. Grimes also opened two bank accounts in the name of MOMC. In all of these documents, Grimes listed herself as the sole officer and director of MOMC. Grimes used different names throughout these documents, including Lea Nehme and Betty Lea Grimes.

### B. Defendants Made Material False and Misleading Representations and Omissions in Connection With the Sale of Precious Metals

23. During the Relevant Period, Defendants operated the MOMC web site, which was accessible to customers located throughout the United States, including in this District. Grimes also provided interested customers with marketing materials that contained the same information as the web site.

24. The MOMC web site and MOMC marketing documents stated that MOMC was a private mining company and precious metals dealer; Olsen owned and operated MOMC; MOMC

6

had been in operation since 1991 and employed 6,000 people worldwide; MOMC owned eight precious metals mines in the United States and Africa, and was developing additional mines in Canada and South America; and MOMC operated as a precious metals dealer, offering to finance precious metals purchases and store precious metals at a depository on the customers' behalf.

25. In fact, MOMC did not exist until April 2013; MOMC did not own or operate any mines; Grimes was the sole officer and director of MOMC; MOMC did not employ any other individuals; and there were no precious metals available for sale.

26. The MOMC web site, and MOMC marketing materials, made the following additional misrepresentations about their expertise:

    a. "In 2007, Olsen Mining became the first mining company selected to be part of the Dow Jones Sustainability World Index.  Olsen Mining industry [sic] leading performance is reflected through high standards in environmental management, health and safety for its employees and by creating value and opportunity for host communities and Olsen Mining is the fastest-growing, lowest cost senior gold producer, with operations and development projects in politically stable jurisdictions throughout the Americas.  Our strong project pipeline is positioned to drive long term, sustainable growth."

    b. "Olsen Mining is a near-term Mining & Dealers producer, building Phase One of the new Olsen Mining Project in the historic Florida Lode.  Ramp-up to full production is planned in the first half of 2013.  The company controls approximately 4.5 miles of strike length in the most prolific portion of the Mother Lode in Amador County.  The company's land holdings historically produced more than 3.5 million of the 7.7 million ounces gold produced from the 10 mile portion of the Mother Lode between the towns of Jackson and Plymouth.  As Olsen Mining achieves positive cash flow, it plans to expand the Lincoln Mine, develop the Keystone resource, and explore for more gold, along strike and at depth, on its extensive land holdings."

    c. "We have a very large market in North America and Africa, mining Gold, Silver, Platinum and Diamonds."

    d. "Olsen's operating assets include two mines in the U.S, six mines [sic] Africa.  Olsen Mining also has a solid pipeline of projects, including the Cerro Negro project in Argentina, the Eléonore gold project in Quebec, Canada, the Cochenout [sic] project in Ontario, Canada, and the El Morro

        project in Chile.  These valuable assets, along with several others, will allow for significant growth in production for years to come."

    e.    "Mark Olsen Mining will accept returns if the customer is not happy with the product that is giving to them, Refunds will be in the original form of payment."

27. Grimes pursued numerous individuals in her efforts to find customers for MOMC. She obtained contact information for many of these individuals from her previous employment as a salesperson for various telemarketing firms, including the firm that sold wholesale diamonds. Grimes communicated with these individuals by telephone, Skype, and facsimile.

28. In their solicitations of these actual and potential customers, Defendants provided customers with the link to the MOMC web site as well as the MOMC marketing materials. These documents stated that customers could purchase a certain quantity of metal by signing an agreement to purchase metals, and (1) paying the full amount due, after which the metals would be delivered to the customer within two weeks of payment; or (2) depositing a percentage of the total metals' value, and arranging for a loan for the remaining amount, with repayment of the loan due upon the customer's resale of the metals; the precious metals would be delivered to the customer within two weeks of the customer's initial payment.

29. After providing actual and potential customers with the MOMC web site and marketing materials, Grimes ultimately persuaded three former diamonds customers, the MOMC Customers, to purchase precious metals, on both a leveraged and fully-paid basis, from MOMC.

30. In March 2017, Grimes admitted that at the time she solicited these MOMC Customers to purchase precious metals, she was aware that the MOMC marketing materials she provided to them contained false information. Nonetheless, despite this knowledge, she continued to solicit customers, and encouraged them to purchase additional precious metals from MOMC.

### C.     Defendants Misappropriated All of the MOMC Customer Funds

31.     MOMC entered into its first sale with Customer 1 in August of 2013. The contract between Customer 1 and MOMC required MOMC to deliver bullion gold bars within two weeks of payment. Customer 1 promptly paid MOMC the full amount due, nearly $40,000, via wire transfer. MOMC never delivered the gold.

32.     MOMC entered into its second and third precious metals sales with Customer 2 in November 2013. Customer 2 signed the first contract with MOMC shortly after receiving MOMC marketing documents from Grimes.

33.     Customer 2 ultimately entered into two separate contracts with MOMC for the purchase of American Eagle silver coins in November 2013. The first contract provided for Customer 2 to pay the full amount due. The second contract, dated two weeks later, provided Customer 2 with financing, requiring him to pay a smaller amount upfront, with full payment due only after he re-sold the coins. However, Defendants pressured Customer 2 to make additional payments to satisfy "customs requirements."

34.     Between November 2013 and January 2014, Customer 2 made six payments to MOMC totaling more than $600,000 under the two contracts. Both contracts similarly required MOMC to deliver the coins within two weeks of payment. However, Customer 2 never received any of the coins he purchased.

35.     Defendants informed Customer 2 that the coins he purchased were being held by a foreign "customs" office. Grimes sent a number of additional documents to Customer 2 via facsimile. These documents purported to be from foreign customs officials. The documents demanded additional funds before the "customs agency" would permit the precious metals to leave the country in which they were located. Customer 2 paid an additional $5,000 to ensure the delivery of the precious metals. However, the precious metals never arrived.

36. In February 2014, MOMC entered into a fourth agreement for the sale of precious metals with Customer 3. Customer 3 contracted with MOMC for the purchase of both gold bars and Krueggerand gold coins. While negotiating the contract with Customer 3, again promising delivery within two weeks, Grimes knew that Customers 1 and 2 never received the precious metals she sold to them on behalf of MOMC. Nonetheless, Grimes, acting on behalf of MOMC, accepted a $230,000 wire transfer from Customer 3, the full amount due under the contract, on February 20, 2014. Again, MOMC never delivered the coins.

37. Within days of receiving each of the wire transfers from the MOMC Customers in the MOMC accounts she had opened, Grimes made numerous wire transfers to foreign bank accounts located in South Africa. Grimes also withdrew money from the MOMC business accounts to pay her personal living expenses, including her monthly rent payments, car payments, and meals at local restaurants, between December 2013 and January 2014.

38. Grimes' final wire transfers to the South African bank accounts occurred in late February 2014 and consisted of four separate $50,000 transfers, totaling $200,000, from the MOMC bank account. Grimes made these transfers shortly after receiving the $230,000 payment from Customer 3. Immediately afterward, Olsen stopped all communications with Grimes and disappeared.

39. Defendants never bought, sold, loaned, stored, or transferred any physical metals for the off-exchange financed precious metals transactions at issue. Likewise, Defendants never delivered any precious metals to any customers in connection with the financed metals transactions at issue. Finally, none of the MOMC Customers was an ECP or an eligible commercial entity ("ECE"), as defined in Section 1a(17) of the Act, 7 U.S.C. § 1a(17) (2012).

### D. Grimes Acted as Controlling Person for MOMC

40. At all times during the Relevant Period, Grimes was the President and sole controlling person of MOMC. Grimes exercised control over the day-to-day operations of MOMC. She solicited customers on behalf of MOMC, generated all account statements on behalf of MOMC, and handled all customer funds received by MOMC. Additionally, Grimes was the sole signatory on all of MOMC's bank accounts. As the sole shareholder and President of MOMC, she solely acted on behalf of MOMC.

## VI. VIOLATIONS OF THE COMMODITY EXCHANGE ACT

### COUNT I
### ILLEGAL OFF-EXCHANGE FINANCED TRANSACTIONS
### Violations of Section 4(a) of the Act

41. Paragraphs 1 through 40 of this Complaint are alleged and incorporated herein by reference.

42. During the Relevant Period, at least one of the retail commodity transactions described in this Complaint were offered and entered into by Defendants: (a) on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis, (b) with persons who are not ECPs or ECEs as defined by the Act, and (c) not made or conducted on, or subject to, the rules of any board of trade, exchange, or contract market.

43. The precious metals discussed in this Complaint are commodities as defined by Section 1a(9) of the Act, 7 U.S.C. § 1a(9) (2012).

44. The retail commodity transactions did not result in actual delivery within 28 days. In fact, there was no actual delivery of precious metals.

45. Pursuant to Section 2(c)(2)(D)(iii) of the Act,7 U.S. C. § 2(c)(2)(D)(iii) (2012), the retail commodity transactions alleged herein are subject to Section 4(a) of the Act, 7 U.S.C. § 6(a) (2012), as if they are contracts of sale for future delivery.

46. As set forth above, during the Relevant Period, Defendants violated Section 4(a) of the Act by offering to enter into, entering into, executing, confirming the execution of, or conducting an office or business in the United States for the purpose of soliciting or accepting orders for, or otherwise dealing in, transactions in, or in connection with, retail commodity transactions.

47. Each offer to enter into, execution, confirmation, solicitation, or acceptance of an order for a retail commodity transaction with a non-ECP customer made during the Relevant Period is alleged in this Complaint as a separate and distinct violation of Section 4(a) of the Act.

48. Grimes directly or indirectly controlled MOMC and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting MOMC's violations of Section 4(a) of the Act. Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012), Grimes is liable for each of MOMC's violations of Section 4(a) of the Act as a controlling person of MOMC.

49. The acts and omissions of Grimes, as described in this Complaint, were done within the scope of her employment and/or agency with MOMC. Therefore, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2017), MOMC is liable as a principal for each act, omission, or failure of Grimes constituting violations of Section 4(a) of the Act.

## COUNT II
## DECEPTIVE DEVICES OR CONTRIVANCES
### Violations of Section 6(c)(1) of the Act and Regulation 180.1(a)

50. Paragraphs 1 through 40 of this Complaint are re-alleged and incorporated herein by reference.

51. Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), provides, in relevant part:

> It shall be unlawful for any person, directly or indirectly, to use or employ or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate . . . .

52. Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2017), provides, in relevant part:

> It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:
>
> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;
> (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;
> (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . .

53. During the Relevant Period, Defendants used or employed manipulative or deceptive devices or contrivances, in connection with contracts of sale of any commodity in interstate commerce, including, but not limited to, making untrue or misleading statements of material facts, or omitting material facts necessary to make the statements not untrue or misleading, to the MOMC Customers, including, but not limited to:

    a. Misappropriating customer funds provided for the purchase of precious metals;

    b. Misrepresenting their investment experience and expertise;

13

      c.      Misrepresenting that they owned and operated mines and dealt in precious metals;

      d.      Misrepresenting that they operated as a precious metals dealer, offering to finance precious metals purchases and store precious metals at a depository on the customers' behalf;

      e.      Misrepresenting that they had precious metals available for sale;

      f.      Misrepresenting that the precious metals purchased by MOMC Customers would be delivered within two weeks of payment;

      g.      Mispresenting that MOMC Customers could receive a refund of their investment; and

      h.      Failing to disclose that Defendants did not use customers' funds to purchase precious metals on behalf of their customers.

By this conduct, Defendants violated Section 6(c)(1) of the Act, and Regulation 180.1(a).

54.     Each misappropriation and misrepresentation or omission of material fact, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation by Defendants of Section 6(c)(1) of the Act and Regulation 180.1(a).

55.     Each manipulative or deceptive device or contrivance, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 6(c)(1) of the Act and Regulation 180.1(a).

56.     Grimes directly or indirectly controlled MOMC and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting MOMC's violations of Section 6(c)(1) of the Act and Regulation 180.1(a).  Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012), Grimes is liable for each of MOMC's violations of Section 6(c)(1) of the Act and Regulation 180.1(a) as a controlling person of MOMC.

57.     The acts and omissions of Grimes, as described in this Complaint, were done within the scope of her employment and/or agency with MOMC.  Therefore, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C § 2(a)(1)(B) (2012) and Regulation 1.2, 17 C.F.R. § 1.2 (2017),

14

MOMC is liable as a principal for each act, omission, or failure of Grimes constituting violations of Section 6(c)(1) of the Act and Regulation 180.1(a).

## COUNT III
### FRAUD BY MATERIAL MISREPRESENTATIONS AND OMISSIONS AND MISAPPROPRIATION IN CONNECTION WITH FINANCED TRANSACTIONS
**Violations of Section 4b(a)(2)(A) and (C) of the Act**

58. Paragraphs 1 through 40 of this Complaint are re-alleged and incorporated herein by reference.

59. Pursuant to Section 2(c)(2)(D)(iii) of the Act, 7 U.S.C. § 2(c)(2)(D)(iii) (2012), the retail commodity transactions engaged in by Defendants are subject to Section 4b(2)(A) and (C) of the Act, 7 U.S.C. § 6b(A), (C) (2012), as if they are contracts of sale of a commodity for future delivery.

60. During the Relevant Period, Defendants, willfully or recklessly, have: (1) cheated or defrauded, or attempted to cheat or defraud, other persons, and/or (2) deceived or attempted to deceive other persons, and done so in or in connection with retail commodity transactions. Defendants did so by, among other things:

   a. Misappropriating customer funds provided for the purchase of precious metals;

   b. Misrepresenting their investment experience and expertise;

   c. Misrepresenting that they owned and operated mines and dealt in precious metals;

   d. Misrepresenting that they operated as a precious metals dealer, offering to finance precious metals purchases and store precious metals at a depository on the customers' behalf;

   e. Misrepresenting that they had precious metals available for sale;

   f. Misrepresenting that the precious metals purchased by MOMC Customers would be delivered within two weeks of payment;

  g. Misrepresenting that MOMC Investors could receive a refund of their investment; and

  h. Failing to disclose that Defendants did not use customers' funds to purchase precious metals on behalf of their customers.

By this conduct, Defendants violated Section 4b(a)(2)(A) and (C) of the Act.

  61. Each act of misappropriation, misrepresentation, and omission including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of Section 4b(a)(2)(A) and (C) of the Act.

  62. Grimes controlled MOMC throughout the Relevant Period and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting the violations of MOMC described in this Count.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012), Grimes is liable as a controlling person for those violations of Section 4b(a)(2)(A) and (C) of the Act.

  63. The acts and omissions of Grimes, as described in this Complaint, were done within the scope of her employment and/or agency with MOMC.  Therefore, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2017), MOMC is liable as a principal for each act, omission, or failure of Grimes constituting violations of  4b(a)(2)(A) and (C) of the Act.

## VII. RELIEF REQUESTED

  WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), and pursuant to its own equitable powers, enter:

  A. An order finding that Defendants violated Sections 4(a), 4b(a)(2), and 6(c)(1) of the Act, 7 U.S.C. §§ 6(a), 6b(a)(2), 9(1) (2012), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2017).

B.  An order of permanent injunction permanently restraining, enjoining, and prohibiting Defendants, and any other person or entity associated with them, from engaging in conduct in violation of Sections 4(a), 4b(a)(2), and 6(c)(1) of the Act and Regulation 180.1(a).

C.  An order of permanent injunction prohibiting Defendants, and any other person or entity associated with them, from directly or indirectly:

    (i)  Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2012));

    (ii)  Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3 (yy), 17 C.F.R. § 1.3(yy)) (2017), for their own personal account or for any account in which they have a direct or indirect interest;

    (iii)  Having any commodity interests traded on their behalf;

    (iv)  Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

    (v)  Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

    (vi)  Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2017);

      (vii)    Acting as a principal (as that term is defined in Regulation 3.1 (a), 17 C.F.R. § 3.1(a) (2017), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the Commission, except as provided for in Regulation 4.14(a)(9); and

      (viii)    Engaging in any business activities related to commodity interests.

D.    An order requiring that Defendants, as well as any successors, disgorge to any officer appointed or directed by the Court all benefits received from the acts or practices that constitute violations of the Act and Regulations as described herein, including, but not limited to, salaries, commissions, loans, fees, revenues and trading profits derived, directly or indirectly, plus pre-judgment interest thereon from the date of such violations, and post-judgment interest;

E.    An order requiring Defendants and any of their successors to make full restitution to every person or entity whose funds Defendants received or caused another person or entity to received pursuant to such procedure as the Court may order, to every customer whose funds Defendants received or caused another person or entity to receive as a result of the acts and practices described herein which constitute violations of the Act and Regulations, pre-judgment interest from the date of such violations;

F.    An order directing Defendants, as well as any successors, to rescind, pursuant to such procedure as the Court may order, all contracts and agreements, whether implied or express, entered into between them and any of the customers whose funds were received by them as a result of the acts and practices which constitute violations of the Act and Regulations, as described herein;

G. An order directing Defendants to pay a civil monetary penalty for each violation of the Act and Regulations of not more than the amount set forth by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1) (2012), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114–74, 129 Stat. 584 (2015), title VII, Section 701, and promulgated in Commission Regulation 143.8, 17 C.F.R. § 143.8 (2017), plus post-judgment interest;

H. An order requiring Defendants, as well as any successors, to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2012); and

I. An order providing such other and further relief as the Court may deem necessary and appropriate under the circumstances.

Dated: June 12, 2018

Respectfully submitted,

/s/ *Aimée Latimer-Zayets*
Aimée Latimer-Zayets
FL Special Bar #A5502458
Alatimer-zayets@cftc.gov
Division of Enforcement
Commodity Futures Trading Commission
1155 21st Street, NW
Washington, DC 20581
Telephone: (202) 418-7626
Fax: (202) 418-5531

Attorney for Plaintiff